UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| FINDLAY INDUSTRIES, INC., individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br>     v.<br><br>AUTOLIV, INC.,<br><br>                      Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Findlay Industries, Inc., individually and on behalf of a proposed class of direct purchasers of Automotive Safety Parts (as defined below) from March 2006 through the present, brings this class action against Autoliv, Inc. under the federal antitrust laws for treble damages and injunctive relief and alleges as follows:

**NATURE OF THE CASE**

1.  From March 2006 to February 2011, the largest United States and global manufacturers of Automotive Safety Parts (as defined below) operated a price fixing cartel in violation of the federal antitrust laws. Defendant and its co-conspirators manufactured or sold Automotive Safety Parts and entered into and implemented a continuing combination and conspiracy to rig bids and fix, raise, maintain or stabilize prices for Automotive Safety Parts sold in the United States. Because of Defendant's unlawful conduct, Plaintiff and the Class members paid artificially inflated prices for Automotive Safety Parts and as a result have suffered antitrust injury to their business or property.

1

2. In the related U.S. Department of Justice Antitrust Division criminal investigation, Autoliv, Inc. ("Autoliv" or the "Defendant") has been criminally charged and has agreed to plead guilty to violations of the Sherman Act.

3. Plaintiff brings this action under the federal antitrust laws, Section One of the Sherman Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Section 4 of the Clayton Act of 1914, 15 U.S.C. § 15 ("Clayton Act"), and asserts the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, the investigation made by its attorneys.

## DEFINITIONS

4. "Automotive Safety Parts" are motor vehicle seatbelts, airbags, and steering wheels, and related products.

5. The "Class Period" is March 2006 through the present.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

7. Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and Defendant resides in, is licensed to do business in, does business in, has agents in, or is found or transacts business in this District.

8. The activities of Defendant and its co-conspirators were within the flow of, were intended to, and did have a substantial effect on, the interstate commerce of the United States.

9. This Court has *in personam* jurisdiction over Defendant because, *inter alia,* it: (a) transacted business throughout the United States, (b) manufactured, sold, shipped, and delivered substantial quantities of Automotive Safety Parts throughout the United States, (c) had substantial contacts with the United States, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States. Further jurisdictional contacts are alleged below.

## THE PARTIES

10. Plaintiff Findlay Industries, Inc. is an Ohio corporation with its principal place of business in Findlay, Ohio. Plaintiff purchased Automotive Safety Parts directly from Defendant and/or its co-conspirators during the Class Period.

11. Defendant Autoliv, Inc. ("Autoliv") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Stockholm, Sweden.

## DEFENDANT'S AGENTS AND CO-CONSPIRATORS

12. The acts alleged in this Complaint to have been done by Defendant were authorized, ordered and performed by its officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of its business affairs.

13. Various other persons or entities not named as Defendants have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

14.  The activities of Defendant and its co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

15.  During the Class Period, Defendant and its co-conspirators manufactured, sold and shipped substantial quantities of Automotive Safety Parts in a continuous and uninterrupted flow of interstate commerce.

## THE WORLDWIDE AND U.S. ANTITRUST INVESTIGATION OF THE MOTOR VEHICLE PARTS INDUSTRY

16.  A worldwide antitrust investigation aimed at suppliers of motor vehicle parts, including Automotive Safety Parts, originated in Europe.

17.  According to the United States Department of Justice, the motor vehicle parts investigation is the "largest criminal investigation the [Department of Justice] has ever pursued," both in terms of scope and potential volume of commerce affected by the alleged illegal conduct.

18.  Commenting on her division's investigation, Shari A. Pozen, Acting Assisting Attorney General in charge of the Department of Justice's Antitrust Division, stated that "[a]s a result of this international price-fixing and bid-ridding conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers,....".  She further stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

19.  "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

**DEFENDANT'S PRICE FIXING CONSPIRACY**

20.     Beginning at least as early as March 2006 and continuing through at least February 2011 Defendant and its co-conspirators established and operated a price fixing cartel to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain Automotive Safety Parts sold in the United States and elsewhere.

**AUTOMOTIVE SAFETY PARTS**

21.     Automotive Safety Parts make up the occupant safety system in a motor vehicle and are comprised of a vehicle's seatbelts, airbags, and its steering wheel.

22.     Seatbelts are safety strap restraints designed to secure an occupant in position in a vehicle in the event of an accident. Seatbelt parts include belt webbing, a buckle, a retractor, and hardware for vehicle installation. Depending on the individual vehicle manufacture's requirements, it may also include a height adjuster, a pretensioner, or other devices associated with the seatbelt.

23.     Airbags are occupant restraints designed to control the movement of an occupant inside of a vehicle in the event of an accident. It consists of a light fabric air bag, an inflator, and an initiator, which initiates the deployment of the airbag. The inflator uses pressurized gas (typically generated by pyrotechnic materials) to rapidly inflate the airbag upon deployment. Depending on the vehicle manufacturer's specifications, it may also include an injection molded plastic decorative cover or other devices associated with the airbag.

24.     Steering wheels consist of a die-cast armature (frame) covered by molded polyurethane and finished with leather, wood trim, or plastic. Depending on vehicle

manufacturer specifications, steering wheels may also include various electronic features and controls.

25. Automotive Safety Parts are installed in new motor vehicles by motor vehicle original equipment manufacturers ("OEMs") as part of the motor vehicle manufacturing process.

26. When purchasing seatbelts, airbags, and steering wheels, automobile manufacturers issue RFQs to automotive parts suppliers on a model-by-model basis for model-specific parts. Automotive parts suppliers submit quotations, or bids, to the automobile manufacturers in response to these RFQs, and the automobile manufacturers award the business to the selected automotive parts supplier for the lifespan of the model, typically four to six years. The bidding process for a particular model usually begins approximately three years before the start of production. Japanese automobile manufacturers procure parts for U.S.-manufactured vehicles both in Japan and the United States.

27. OEMs include domestic OEMs such as the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic OEMs who also operate manufacturing plants in the U.S. For example, during the Class Period, Nissan manufactured cars in Mississippi, Toyota in Kentucky, BMW in South Carolina, Honda, Hyundai and Mercedes-Benz in Alabama and Kia in Georgia. Suppliers such as Plaintiff purchased Automotive Safety Parts directly from Defendant or its co-conspirators, which they then sold to OEMs or other suppliers to OEMs.

28. Defendant and its co-conspirators supplied Automotive Safety Parts to OEMs and component manufacturers ultimately to be installed in vehicles manufactured or sold in the United States and elsewhere.

29. Plaintiff and members of the proposed Class purchased Automotive Safety Parts directly from Defendant and/or its co-conspirators during the Class Period.

30. During the Class period, Defendant and its co-conspirators, who in a competitive market would be horizontal competitors with one another, engaged in a conspiracy to rig bids for and to fix, maintain, or stabilize prices of Automotive Safety Parts. As a result of their unlawful conduct, Defendant did not compete with other Automotive Safety Parts manufacturers, but instead enjoyed business insulated from competition from the other manufacturers of such products.

**THE CHARACTERISTICS OF THE MARKET FOR AUTOMOTIVE SAFETY PARTS ARE CONDUCIVE TO CONCLUSION**

31. Several important economic characteristics of the market for Automotive Safety Parts render it conducive to Defendant's price fixing conspiracy.

*High Barriers to Entry*

32. There are high barriers to entry in the market for Automotive Safety Parts.

33. A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help facilitate the cartel.

34. Entry requires a company to incur significant start-up capital expenditures. A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor.

35. Another factor contributing to barriers to entry is the common use of contracts between suppliers and purchasers of Automotive Safety Parts. A new entrant would face a significant hurdle to break into the market in the face of existing contracts with incumbent suppliers.

*Price Inelasticity*

36. When a seller of goods or services can increase prices without suffering substantial reduction in sales, pricing is considered inelastic. In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic. Otherwise, increased prices would result in declining use of services, revenues, and profits.

37. Pricing for Automotive Safety Parts is highly inelastic. OEMs must use Automotive Safety Parts. Certain Automotive Safety Parts are required by law to be built into new motor vehicles. There are no viable substitute products. As a result, Defendant and its co-conspirators have been able to raise prices without losing revenues. The cartel thus reaped exorbitant profits by illegally fixing prices.

*Opportunities for Collusion*

38. Defendant attended industry events, fostering opportunities to conspire. Such industry events have provided a myriad of opportunities to meet, conspire, and share information.

**UNITED STATES CRIMINAL CHARGES AND AUTOLIV'S GUILTY PLEA**

39. On June 6, 2012, DOJ announced that Autoliv had agreed to pay a $14.5 million criminal fine and plead guilty to a two-count criminal information charging Autoliv with engaging in conspiracies to rig bids for, and to fix, stabilize and maintain the prices of seatbelts, airbags and steering wheels sold to automakers in the United States and elsewhere.

40. According to the Department of Justice, Autoliv and its co-conspirators carried out the conspiracies by agreeing, during meetings and conversations, to allocate the supply of seatbelts, airbags and steering wheels on a model-by-model basis.

41. According to the criminal Information filed against Autoliv, Autoliv and its co-conspirators carried out the conspiracies by:

    a. Participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to certain Japanese motor vehicle manufacturers for seatbelts, airbags, and steering wheels;

    b. Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain Japanese motor vehicle manufacturers for seatbelts, airbags, and steering wheels;

    c. Agreeing, during those meetings, conversations, and communications, to allocate the supply of seatbelts, airbags, and steering wheels sold to certain Japanese motor vehicle manufactures on a model-by-model basis;

    d. Submitting bids and price quotations to certain Japanese automobile manufacturers with the agreements reached;

    e. Selling seatbelts, airbags, and steering wheels to certain Japanese automobile manufacturers at collusive and non-competitive prices; and

    f. Accepting payment for seatbelts, airbags, and steering wheels sold to certain Japanese automobile manufacturers at collusive and non-competitive prices.

42. Scott D. Hammond, Deputy Assistant Attorney General of the Antitrust Division's criminal enforcement program stated, "[b]y meeting in secret and agreeing to allocate the supply of various automotive parts, the conspirators colluded to rip off automotive manufacturers in the United States and abroad. These conspiracies eliminated competition and resulted in inflated prices to automotive manufacturers for parts in cars sold to U.S. consumers."

43. On June 6, 2012, Autoliv issued a press release which stated in part:

> "[t]he Antitrust Division of the U.S. Department of Justice (DOJ) today announced a plea agreement with Autoliv, Inc. (NYSE: ALV and SSE: ALIV SDB) …This effectively ends Autoliv's role as a subject of the matters investigated… The Company will continue to cooperate with the DOJ in its investigations of other auto-parts suppliers.
>
> "It is simply unacceptable that we have ended up in this situation in the first place. It goes against everything we stand for," said Jan Carlson, President and CEO. "Therefore, we have cooperated extensively with the DOJ to investigate and rectify the matter as quickly as possible and, as a result, we have reached an early resolution of our part of this industry-wide investigation."
>
> This settlement does not include the ongoing investigation by the European Commission (EC), the European antitrust authority. While the duration or ultimate outcome of the EC investigation cannot be predicted or estimated, it is probable that the Company's operating results and cash flows will be materially adversely impacted for the reporting periods in which the EC investigation is resolved or becomes estimable.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action on behalf of itself and pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as the representative of a Class defined as follows:

> All direct purchasers of Automotive Safety Parts in the United States from Defendant or its co-conspirators (or their controlled subsidiaries, affiliates, or joint-ventures) from March 2006 through the present ("the Class").

45.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  While the exact number of Class members is unknown to Plaintiff, it is believed to be in the hundreds.  The identity of the members of the Class can be readily determined from information and records in the possession of Defendant and its co-conspirators.

46.     Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendant and its

10

co-conspirators, *i.e.*, they have paid artificially inflated prices for Automotive Safety Parts as a result of Defendant and its co-conspirators' anticompetitive and unlawful conduct.

47. Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

48. Plaintiff is represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

49. Questions of law and fact common to members of the Class predominate over questions, if any, that may affect only individual Class members because Defendant and its co-conspirators have acted on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Defendant and its co-conspirators' anticompetitive and unlawful conduct.

50. Questions of law and fact common to the Class include, but are not limited to:

   a. Whether Defendant and its co-conspirators contracted, combined, or conspired to fix, raise, maintain, or stabilize prices, or to rig bids for, Automotive Safety Parts;

   b. The existence and duration of the contract, combination, or conspiracy alleged herein;

   c. Whether the contract, combination, or conspiracy caused Automotive Safety Parts prices to be higher than they would have been in the absence of Defendant's conduct;

   d. Whether Defendant's conduct caused injury to the business or property of Plaintiff and members of the Class;

   e. Whether Defendant's conduct violates Section 1 of the Sherman Act; and

  f. The appropriate measure of the amount of damages suffered by the Class.

51. A class is superior to the other methods available for the fair and efficient adjudication of this litigation since individual joinder of all Class members is impracticable. The damages suffered by the individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the availability of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Further, individual litigation presents the potential for inconsistent judgments and would greatly magnify the delay and expense to all parties and the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

52. Defendant's anti-competitive conduct has had the following effects:

  a. Price competition has been restrained, suppressed, or eliminated with respect to Automotive Safety Parts;

  b. The prices of Automotive Safety Parts have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

  c. Purchasers of Automotive Safety Parts have been deprived of free and open competition in the Automotive Safety Parts market.

53. As a result of the contract, combination, or conspiracy, Plaintiff and Class members paid supracompetitive prices for Automotive Safety Parts, and Plaintiff and Class members have sustained injury to their business or property.

## FRAUDULENT CONCEALMENT

54. Defendant and its co-conspirators affirmatively and wrongfully concealed their anti-competitive conduct from Plaintiff and the Class, from at least March 2006 through at least

12

February 2011, when the antitrust investigation of the Automotive Safety Parts industry became public. During that time, Plaintiff and the Class did not learn or discover the operative facts giving rise to the instant Complaint, despite Plaintiff's due diligence. Thus, Defendant and its co-conspirators' fraudulent concealment tolled the statute of limitations through at least February 2011.

55. Defendant and its co-conspirators represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, Defendant and its co-conspirators misled Plaintiff and members of the Class as to the true, collusive, and coordinated nature of their bid rigging, customer allocation, and price-fixing activities.

56. Defendant and its co-conspirators' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

57. In particular, Defendant and its co-conspirators participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

58. During these meetings, conversations, and communications, Defendant and its co-conspirators agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

59. Defendant and its co-conspirators likewise agreed to allocate the supply of Automotive Safety Parts sold to customers in the United States and elsewhere on a model-by-model basis.

60. Defendant and its co-conspirators also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

61. In accordance with the agreements reached by Defendant and its co-conspirators, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

62. As a result of such coordinated actions, and unbeknownst to Plaintiff, Defendant and its co-conspirators sold Automotive Safety Products to purchasers in the United States and elsewhere at collusive and noncompetitive prices.

63. To keep the sale of Automotive Safety Products at collusive and noncompetitive prices a secret, Defendant and its co-conspirators employed certain measures, including but not limited to, using code names and meeting at private residences or remote locations.

64. Moreover, Defendant and its co-conspirators' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

65. Despite its due diligence, Plaintiff had no knowledge of Defendant and its co-conspirators' unlawful contract, combination, or conspiracy.

66. In the course of purchasing Automotive Safety Parts, Plaintiff researched and compared prices of the specific products offered by Defendant and its co-conspirators. Plaintiff also read and reviewed pricing documents it received from Defendant and its co-conspirators.

67. OEMs generally specified the component Automotive Safety Parts Plaintiff was required to purchase and the vendors of those products.

68. In the exercise of due diligence, Plaintiff attempted to purchase Automotive Safety Parts at minimum prices. In Plaintiff's experience, however, lower priced non-specified Automotive Safety Parts were not available.

69. Plaintiff exercised due diligence in researching and comparing prices of Automotive Safety Parts to ascertain whether it was being offered competitive prices for such products.

70. Plaintiff also kept abreast of pricing and developments in the Automotive Safety Parts industry by reviewing trade publications and attending industry trade shows.

71. Plaintiff did not and could not have discovered Defendant and its co-conspirators' unlawful contract, combination, or conspiracy at any earlier date, despite its due diligence. Defendant and its co-conspirators undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiff and the Class of the reasons for price increases, and engaging in secret conversations and other communications concerning the allocation of customers, bid rigging, and price-fixing of Automotive Safety Parts.

### COUNT I: CLAIM FOR VIOLATION OF SHERMAN ACT § 1

72. Plaintiff incorporates by reference the allegations set forth above and adopts same as though fully set forth herein.

73. Defendant and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

74. The acts done by Defendant as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendant's affairs.

75. Commencing at least as early as March 2006 and continuing until at least February 2011, the exact dates being presently unknown to Plaintiff, Defendant and its co-

conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Safety Parts, thereby causing anticompetitive effects.

76. Defendant and its co-conspirators' anti-competitive acts were intentionally directed at the United States market for Automotive Safety Parts and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for those products throughout the United States.

77. As a result of the contract, combination, or conspiracy alleged herein, the prices charged to Plaintiff and members of the Class for Automotive Safety Parts were unlawfully raised, fixed, maintained, or stabilized in the United States.

78. The contract, combination, or conspiracy has had the following effects:

   a. Prices paid by Plaintiff and members of the Class for Automotive Safety Parts were raised, fixed, maintained, or stabilized at non-competitive levels;

   b. Plaintiff and members of the Class have been deprived of the benefits of free, open, and unfettered competition in the market for Automotive Safety Parts; and

   c. Competition in the market for Automotive Safety Parts has been unlawfully restrained, suppressed, or eliminated.

79. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and members of the Class have been damaged and will continue to be damaged by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendant as alleged herein.

80. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

81. Plaintiff and members of the Class are entitled to an injunction against Defendant, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A. The Court determine that this action may be maintained as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

B. The unlawful contract, combination, or conspiracy alleged herein be adjudicated and decreed to have been in violation of Section 1 of the Sherman Act;

C. Judgment be entered for Plaintiff and the Class against Defendant for three times the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of this action, including reasonable attorneys' fees and expenses;

D. Defendant be enjoined from continuing the unlawful contract, combination, or conspiracy alleged herein; and

E. Plaintiff and the Class be granted such other, further, and different relief as the case may require or as the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: July 12, 2012

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road; Ste. 111

17

Bloomfield Hills, MI 48304
Telephone: 248-971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Gregory P. Hansel
Randall B. Weill
Jonathan G. Mermin
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU &
PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jcarver@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Michael J. Freed
Steven A. Kanner
William H. London
Douglas A. Millen
Michael L. Silverman
Michael E. Moscovitz
FREED KANNER LONDON &
MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
mfreed@fklmlaw.com
skanner@fklmlaw.com
wlondon@fklmlaw.com
dmiller@fklmlaw.com
msilverman@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF &
WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Joseph M. Fisher (P13542)
Karen H. Safran (P51317)
CARSON FISCHER, P.L.C.
411 Andover Road West – Second Floor
Bloomfield Hills, MI 48302-1924
(248) 644-4840
jfisher@carsonfisher.com
ksafran@carsonfisher.com

*Counsel for Plaintiff Findlay Industries, Inc. and the Proposed Class*